JUDGE DAVID BRIONES

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

FILED

2023 AUG 17  PM 3:48

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY

| | |
|---|---|
| JOSHUA CACHO, a Florida resident, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| RBM INSURANCE, INC., d/b/a ALLIANCE & ASSOCIATES FINANCIAL SERVICES, INC., | § |
| | § |
| Defendant. | § |

EP23CV0303

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1.      Plaintiff JOSHUA CACHO ("Plaintiff") a natural person, resident of the Western District of Texas, and was present in Texas for the last two calls in this Complaint, in this case in El Paso County, Texas.

2.      Defendant RBM INSURANCE, INC., d/b/a ALLIANCE & ASSOCIATES FINANCIAL SERVICES, INC., ("Alliance") is a Profit Corporation organized and existing under the laws of Florida and can be served via registered agent Stoneburner Berry Purcell & Campbell, P.A. at 1031 Lasalle Street Jacksonville, Florida 32207, United States.

3.      John Does 1-33 are overseas telemarketers Defendant Alliance hired to solicit discounted health insurance policies at their behest. John Does 1-33 are out of reach and jurisdiction of the laws of the United States.

1

## JURISDICTION AND VENUE

4.      Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

5.      This Court has specific personal jurisdiction over Defendant because they have

repeatedly placed calls to Texas residents and derived revenue from Texas residents, and they sell

goods and services to Texas residents, including Plaintiff.

6.      This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising

under Florida Statutes § 501.059 and § 501.601 and because the claims arise from the same

nucleus of operative fact, i.e., Defendant's telemarketing interactive prerecorded robotic message

calls to Plaintiff and adds little complexity to the case.

## VENUE

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a

substantial part of the events giving rise to the claims—the automated robocalls and sale of

goods and services directed at Texas residents, including the Plaintiff—occurred in this District

and because the Plaintiff resides in this District.

8.      This Court has venue over Defendant ALLIANCE because the automated robocalls at

issue were sent by or on behalf of the above-named Defendant to Plaintiff, a Texas resident.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

9.      In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing

equipment that could target millions of consumers *en masse*.  Congress found that these calls

were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11.    The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13.    Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14.    The TCPA provides a private cause of action to persons who receive calls in violation of 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

15.    According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

---

[1]*See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

16.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

17.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19.     The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

4

21.     The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential umber generator; and (B) to dial such numbers. *Id*. at § 227(a)(1)

22.     As to what type of dialing equipment constitutes an ATDS, the TCPA vests to the Federal Communication Commission ("FCC") the responsibility to promulgate regulations implementing the TCPA's requirements. *Id*. at § 227(a)(1).

23.     Over the last nineteen years, the FCC has repeatedly recognized that a predictive dialer is an ATDS that is subject to regulation by the TCPA. In its 2003 Order, the FCC also defined a "predictive dialer" holding:

[A] predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call.[1]

24.     In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[2]

25.     A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal

quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FLORIDA STATUTES § 501.059

26.    Florida Statutes § 501.059 makes it a violation to "make or knowingly allow a telephone sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

27.    A "telephone sales call" is defined as a 'telephone call, text message, voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(j).

28.    "Prior express written consent" means an agreement in writing that: Fla. Stat. § 501.0059(g).

    1. Bears the signature of the called party;

    2. Clearly authorizes the person making or allowing the placement of a telephonic sales calls by telephone call, text message, or voicemail transmission to deliver or cause to be delivered to the called party a telephone sales call using an automated system for the selection or dialing of telephone numbers, the playing of a recorded message when a connection is completed to a number called, or the transmission of a prerecorded voicemail;

    3. Includes the telephone number to which the signatory authorizes a telephonic sales

call to be delivered; and

4. Includes a clear and conspicuous disclosure informing the called party that;

    a. By executing the agreement, the called party authorizes the person making or allowing the placement of a telephonic sales call to deliver or cause to be delivered a telephonic sales call to the called party using an automated system for the selection or dialing of telephone numbers or playing of a recorded message when a connection is completed to a number called; and

    b. He or she is not required to directly or indirectly sign the written agreement or to agree to enter into such agreement as a condition of purchasing any property, goods, or services.

29.    A person aggrieved by a violation of this section may bring an action to recover actual damages or $500, whichever is greater.  Fla. Stat. § 501.059(10)(a)(2).

30.    If the court finds that the Defendant's willfully or knowingly violated this section or rules adopted pursuant to this section, the court may, in its discretion, increase the amount of the award to an amount equal to not more than three times the amount available under paragraph (a). Fla. Stat. § 501.059(10)(a)(2)(b).

## FLORIDA TELEMARKETING ACT

31.    A commercial telephone seller or salesperson making a commercial telephone solicitation call may not use technology that deliberately displays a different caller identification number than the number the call is originating from to conceal the true identity of the caller.  Fla. Stat. § 501.616(7)(b).

32.    A commercial telephone seller or salesperson may not transmit more than three commercial telephone solicitation phone calls from any number to a person over a 24-hour

period on the same subject matter or issue, regardless of the phone number used to make the call. Fla. Stat. § 501.616(6)(b).

33.     In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or punitive damages, including costs, court costs, and attorney's fees.  No provision of this part shall be construed to limit any right or remedy provided under law.  Fla. Stat. § 501.625.

## The Texas Business and Commerce Code § 302.101

34.     The Texas Business and Commerce Code requires sellers to obtain a registration certificate from the Secretary of State in order to make telephone solicitations inside the state of Texas or to residents located in Texas.

35.     The Plaintiff may seek damages of violations of Texas Business and Commerce Code § 302.101 of to $5,000.00 per violation, reasonable costs of prosecuting the action, court costs investigation costs, depositions expenses, witness fees, and attorney's fees.

36.     Texas Business and Commerce code § 302.101 provides a private right of action. A violation of Chapter 302 "is a false, misleading or deceptive act of practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right of remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

37.     The use or employment by any person of a false, misleading, or deceptive act or practice causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50

## FACTUAL ALLEGATIONS

38.     Plaintiff's personal cell phone ending in 3823 has been registered on the National Do-

Not-Call Registry for more than thirty-one (31) days prior to the first call received from Defendant ALLIANCE's telemarketers.

39.     Plaintiff personally registered the cell phone at issue in this case on the National-Do-Not-Call Registry on November 23, 2022.

40.     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

41.     Plaintiff was residing in Florida from the beginning of time up until July 16, 2023, in which he has been residing in Texas currently.

42.     Defendant ALLIANCE operates as an insurance broker for multiple companies.

43.     Defendant ALLIANCE called Plaintiff at least thirty-six (36) times. All calls were unauthorized sales calls soliciting discounted health insurance policies.

44.     Upon information and belief Defendant ALLIANCE's overseas telemarketers called Plaintiff more times over the last four (4) years that he is currently unaware of without the benefit of Discovery.

45.     Upon information and belief Defendant ALLIANCE used other marketing agencies to contact Plaintiff over the last four (4) years that Plaintiff is unaware of at this time without the benefit of Discovery.

46.     **Call #1, DNC Request #1,** *See Table A,* On February 03, 2023, at 3:20 PM Plaintiff received a call from 713-565-9957. Plaintiff answered with a "hello" and was greeted by a foreign-sounding telemarketer claiming his name was "John" from Florida Blue Health Insurance.

47.     Plaintiff told the representative who had a heavy "Middle Eastern" accent that he was on

the DNC list and to not call back again.

**48.**    Call #2, DNC Request #2, See Table A, on February 07, 2023, at 10:13 AM, Plaintiff received a call from 618-468-8074. Plaintiff answered with a "hello" and was greeted by a foreign-sounding telemarketer claiming his name was "Stephen" from Florida Blue Health Insurance.

**49.**    Plaintiff engaged Stephen for the sole purpose of identifying the party(s) responsible for the illegal telemarketing call and ignored the DNC Request.

**50.**    Plaintiff was informed that due to his current age, he was not eligible for the discounted health insurance. Plaintiff informed Stephen to remove his information from the database and to not call him again.

**51.**    Calls #3-32, See Table A, Plaintiff received at least Thirty (30) calls soliciting discounted health insurance policies from "Florida Blue Health Insurance". Each call Plaintiff disconnected the line without speaking to the rep.

**52.**    **Call #33,** *See Table A*, on August 07, 2023, at 8:56 AM, Plaintiff received a call from 251-365-7434. Plaintiff answered with "hello" and was greeted by a foreign-sounding telemarketer claiming his name was "Christina" from Florida Blue Health Insurance.

**53.**    Plaintiff engaged Christina for the sole purpose of identifying the party(s) responsible for numerous of calls received over the last six months. Christina informed Plaintiff there was an echo on the line and needed to call him back later.

**54.**    Call #34, on August 07, 2023, at 10:29 AM, Plaintiff received a call from 251-383-6559. Plaintiff answered with hello and was greeted by Christina from the previous call.

**55.**    Plaintiff asked why the number was different than then previous caller ID, Christina explained the caller IDs are spoofed to a local random number so that potential clients could

answer the phone. The call dropped during the call.

**56.**     Call #35, on August 07, 2023, at 10: 31 AM, Plaintiff received a call from 251-383-6538.

Plaintiff answered with hello and was greeted by Christina from calls# 33-34, *See Paragraphs*

*52-56*. Plaintiff was transferred to Iona Brown, a licensed insurance agent from Florida.

**57.**     Call #36, on August 07, 2023, at 10: 39 AM, Plaintiff received a call from 954-257-0463.

Plaintiff answered with hello and was greeted by Iona Bowen from call #35. Shortly after the call

Plaintiff received an email and text message with documents confirming the identity of

Defendant Alliance as the responsible party.

**58.**     Table A below displays the calls received from Defendant ALLIANCE.

   **Table A**

| NO. | Date | Time | Caller ID | Notes |
|-----|------|------|-----------|-------|
| 1 | Feb 03, 2023 | 3:20 PM EST | (713) 565-9957 | John - Florida Blue Health Insurance - DNC Request #1 |
| 2 | Feb 07, 2023 | 10:13 AM EST | (618) 468-8074 | Stephen- Florida Blue Health Insurance - DNC Request #2 |
| 3 | Feb 07, 2023 | 10:35 AM EST | (407) 577-3212 | Stephen - Florida Blue Health Insurance - DNC Request #3 |
| 4 | Feb 13, 2023 | 3:22 PM EST | (607) 270-6170 | Mary - Florida Blue Health Insurance - DNC Request #4 |
| 5 | Feb 23, 2023 | 4:50 PM EST | (754) 203-4566 | Jason - Florida Blue Health Insurance |
| 6 | Feb 27, 2023 | 5:56 PM EST | (407) 269-8412 | Jonathan - Florida Blue Health Insurance |
| 7 | Mar 02, 2023 | 12:41 PM EST | (865) 353-5890 | Tim - Florida Blue Health Insurance |
| 8 | Mar 03, 2023 | 5:13 PM EST | (332) 699-8987 | John - Florida Blue Health Insurance |
| 9 | Mar 07, 2023 | 3:24 PM | (802) 213-4778 | Daniel - Florida Blue Health Insurance |

| NO. | Date | Time EST | Caller ID | Notes |
|-----|------|----------|-----------|-------|
|     |      | EST      |           |       |
| 10  | Mar 08, 2023 | 6:30 PM EST | (407) 329-6725 | Mark - Florida Blue Health Insurance |
| 11  | Mar 13, 2023 | 4:21 PM EST | (405) 276-5550 | Anne - Florida Blue Health Insurance |
| 12  | Mar 14, 2023 | 12:43 PM EST | (713) 564-7415 | Justin - Florida Blue Health Insurance |
| 13  | Mar 16, 2023 | 4:34 PM EST | (754) 256-6338 | Sam - Florida Blue Health Insurance |
| 14  | Mar 22, 2023 | 2:41 PM EST | (318) 520-9028 | Marcus - Florida Blue Health Insurance |
| 15  | Mar 23, 2023 | 4:15 PM EST | (405) 276-5550 | Tim - Florida Blue Health Insurance |
| 16  | Mar 29, 2023 | 5:43 PM EST | (469) 388-0634 | Cindy - Florida Blue Health Insurance |
| 17  | Apr 03, 2023 | 2:59 PM EST | (202) 979-6020 | John - Florida Blue Health Insurance |
| 18  | Apr 03, 2023 | 3:01 PM EST | (202) 979-6021 | John - Florida Blue Health Insurance |
| 19  | Apr 04, 2023 | 12:38 PM EST | (706) 810-2570 | Richard - Florida Blue Health Insurance |
| 20  | Apr 05, 2023 | 3:47 PM EST | (737) 258-7119 | Michael - Florida Blue Health Insurance |
| 21  | Apr 06, 2023 | 11:28 AM EST | (407) 577-4565 | Robert - Florida Blue Health Insurance |
| 22  | Apr 06, 2023 | 3:24 PM EST | (706) 810-2570 | Ashley - Florida Blue Health Insurance |
| 23  | Apr 10, 2023 | 10:38 AM EST | (843) 439-5213 | Sam - Florida Blue Health Insurance |
| 24  | Apr 11, 2023 | 11:48 AM EST | (405) 276-5550 | Joshua - Florida Blue Health Insurance |

| NO. | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 25 | Apr 12, 2023 | 11:05 AM EST | (405) 276-5550 | David - Florida Blue Health Insurance |
| 26 | Apr 13, 2023 | 10:27 AM EST | (405) 276-5550 | Adam - Florida Blue Health Insurance |
| 27 | Apr 20, 2023 | 2:00 PM EST | (469) 310-1017 | Mike - Florida Blue Health Insurance |
| 28 | Apr 25, 2023 | 2:35 PM EST | (407) 571-0171 | Samuel - Florida Blue Health Insurance |
| 29 | May 18, 2023 | 11:22 AM EST | (407) 577-7493 | Lisa - Florida Blue Health Insurance |
| 30 | May 24, 2023 | 6:13 PM EST | (407) 759-4854 | Edward - Florida Blue Health Insurance |
| 31 | May 26, 2023 | 5:56 PM EST | (407) 574-1552 | Andrew - Florida Blue Health Insurance |
| 32 | Jun 20, 2023 | 6:33 PM EST | (407) 674-9681 | Alex - Florida Blue Health Insurance |
| 33 | Aug 07, 2023 | 8:56 AM MT | (251) 365-7434 | Christina- Florida Blue Health Insurance - told me she would call me back as there was a bad echo on the line |
| 34 | Aug 07, 2023 | 10:29 PM MT | (251) 383-6559 | Christina - Florida Blue Health Insurance - call dropped |
| 35 | Aug 07, 2023 | 10:31 PM MT | (251) 383-6538 | Christina - Florida Blue Health Insurance - transferred to Iona Bowen |
| 36 | Aug 07, 2023 | 10:39 AM MT | (954) 257-0463 | Iona Brown called from cell phone - sold policy received email and other documents |

**59.**    Plaintiff did not have an established business relationship with Defendant

ALLIANCE, nor did Plaintiff consent to the calls sent to his personal phone.

**60.**    Each and every solicitation call from Defendant ALLIANCE after February 03,

2023, was a knowing and willful violation of the TCPA as Plaintiff had Delivered a

DNC request to Defendant Resolve on February 03, 2023, at 3:20 AM EST.

**61.**     Each and every call phone call between February 07, 2023, and August 07,

2023, was a knowing and willful violation as Plaintiff had informed Defendant

ALLIANCE's telemarketers he wasn't interested and to stop calling.

**62.**     Plaintiff did not provide his phone number to Defendant ALLIANCE or their

telemarketers at any point.

**63.**     Upon information and belief, Defendant ALLIANCE did not have a written do-

not-call policy while their telemarketers were sending Plaintiff the calls.

**64.**     Upon information and belief, Defendant ALLIANCE did not train their

employees who engaged in telemarketing on the existence and use of any do-not-call

list.

**65.**     Such conduct violates the TCPA and its implementing regulations, 47 CFR §

64.1200(d)(3) (requiring telemarketers to honor and record DNC requests when

made).

**66.**     Defendant knew or should have known that its conduct would violate the

TCPA and its regulations because Defendant ALLIANCE operates in a highly

regulated telephone solicitation industry.

**67.**     ALLIANCE knew or should have known the requirements for making

TCPA-compliant telemarketing calls and thus knew or should have known that the

calls complained of herein violated the TCPA and its regulations.

**68.**     Defendant knew or should have known the requirements for making TCPA, FTSA, and

Texas sales compliant telemarketing calls and thus knew or should have known that the

14

unauthorized telemarketing calls and the many disregarded DNC requests complained of herein

violated the TCPA, FTSA, Texas Business Commerce Code 302.101 and all of their regulations.

**69.**     No emergency necessitated these calls.

## VICARIOUS LIABILITY OF DEFENDANT ALLIANCE

**70.**     Defendant ALLIANCE is vicariously liable for the telemarketing calls that

generated the leads on their behalf.

**71.**     The FCC is tasked with promulgating rules and orders related to the enforcement of

the TCPA. 47 U.S.C. § 227(b)(2).

**72.**     The FCC has explained that its "rules generally establish that the party on whose

behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules &*

*Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd.

12391, 12397 ¶ 13

  (1995).

**73.**     The FCC reiterated that a company on whose behalf a telephone call is made bears

the responsibility for any violations. *In re Rules and Regulations Implementing the*

*Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008)

(recognizing "on behalf of" liability in the context of an autodialed or prerecorded message

call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

**74.**     The FCC confirmed this principle in a declaratory ruling holding that sellers such as

Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave
> consumers in many cases without an effective remedy for
> telemarketing intrusions. This would particularly be so if the
> telemarketers were judgment-proof, unidentifiable, or located outside

15

the United States, as is often the case. Even where third-party
telemarketers are identifiable, solvent, and amenable to judgment
limiting liability to the telemarketer that physically places the call
would make enforcement in many cases substantially more expensive
and less efficient, since consumers (or law

enforcement agencies) would be required to sue each marketer
separately in order to obtain effective relief. As the FTC noted, because
sellers may have thousands of independent marketers, suing one or a
few of them is unlikely to make a substantive difference for consumer
privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote

omitted) (alteration marks and internal quotation marks omitted).

**75.**     More specifically, *Dish* held that, even in the absence of evidence of a formal

contractual relationship between the seller and the telemarketer, a seller is liable for

telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls.

*Id.* at 6586 ¶ 34.

**76.**     The ruling rejected a narrow view of TCPA liability, including the assertion that a

seller's liability requires a finding of formal agency and immediate direction and control over

the third- party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

**77.**     To the contrary, the FCC—armed with extensive data about robocalls and Americans'

complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at

6587

¶ 36.

**78.**     Vicarious liability is important because reputable, traceable, and solvent companies

that benefit from illegal telemarketing are "in the best position to monitor and police TCPA

compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

79.     Defendant ALLIANCE is legally responsible for ensuring that the affiliates that make telemarketing calls on its behalf comply with the TCPA when so doing.

80.     Defendant ALLIANCE knowingly and actively attempted to accept business that originated through illegal telemarketing.

81.     Defendant ALLIANCE knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketers to cease that conduct.

82.     By hiring a company to make calls on their behalf, Defendant ALLIANCE "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

83.     Moreover, Defendant ALLIANCE maintained interim control over the actions of their telemarketers.

84.     For example, Defendant ALLIANCE had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

85.     Furthermore, Defendant ALLIANCE had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS to contact potential customers of Defendant ALLIANCE and the ability to require them to respect the National Do Not Call Registry.

86.     Defendant ALLIANCE also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

87.     Defendant ALLIANCE donned their telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched "discounted health insurance

policies" in the abstract.

88.        Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

89.        "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

90.        A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

91.        Defendant ALLIANCE's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant ALLIANCE. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

92.        Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

93.        Defendant ALLIANCE is the liable party as the direct beneficiary of the illegal

telemarketing as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for "discounted health insurance policies" on their behalf.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

94.    Defendant ALLIANCE's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

95.    Defendant ALLIANCE's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

96.    Defendant ALLIANCE's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

97.    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of Plaintiff's cell phone.

## PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

98.    The calls were to Plaintiff's cellular phone number 407-577-3823 which is Plaintiff's personal phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phones registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## CAUSES OF ACTION:

## COUNT ONE:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

**99.** Plaintiff incorporates the preceding paragraphs 1-98 as if fully set forth herein.

**100.** Defendant ALLIANCE's telemarketers called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

**101.** Plaintiff was statutorily damaged at least thirty-six (36) times under 47 U.S.C. § 227(c)(3)(F) by Defendant ALLIANCE by the telemarketing calls described above, in the amount of $500.00 per call.

**102.** Plaintiff was further statutorily damaged because Defendant ALLIANCE willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

**103.** Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT TWO:

### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

**104.** Plaintiff incorporates the preceding paragraphs 1-98 as if fully set forth herein.

**105.** The foregoing acts and omissions of Defendant ALLIANCE and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

    a.   A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2]

    b.   Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

    c.   In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

**106.**     Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

**107.**     Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

## COUNT THREE

### (Violations of Florida Statutes § 501.059)

**108.**     Plaintiff incorporates the preceding paragraphs 1-98 as if fully set forth herein.

**109.**     Defendant ALLIANCE and/or their affiliates and authorized representatives called Plaintiff using automated means without Plaintiff's express written consent. Fla. Stat. § 501.059(8)(a).

**110.**     Defendant ALLIANCE did not have Plaintiff's prior express written consent when making the telephonic solicitation calls. Fla. Stat. § 501.059(1)(g).

**111.**     Plaintiff is entitled to an award of at least $500 in damages for each such violation of Fla. Stat. § 501.059(8)a) pursuant to Fla. Stat. § 501.059(10)(a)(2).

---

[2] *Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[3] *Seeid.* at 425 (codifying a June 26, 2003 FCC order).
[4] *Seeid.* at 425 (codifying a June 26, 2003 FCC order).

112.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. Fla. Stat. § 501.059(10)(a)(b).

## COUNT FOUR

### (Violations of Florida TELEMARKETING ACT)

113.    Plaintiff incorporates the preceding paragraphs 1-96 as if fully set forth herein.

114.    Defendant ALLIANCE called Plaintiff more than three times within a 24-hour period. Fla. Stat. 501.616(6)(b).

115.    Defendant ALLIANCE and/or their affiliates and authorized representatives called Plaintiff using automated dialing equipment that intentionally transmitted false caller identification information. Fla. Stat. 501.616(7)(b).

116.    In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or penalties and/or punitive damages, including costs, court costs, attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law. Fla. Stat. 501.625.

## COUNT FIVE
### (Violations of Texas Business and Commerce Code 302.101)
### Failure to obtain a Telephone Solicitation Registration Certificate

117.    Plaintiff incorporates the preceding paragraphs 1-98 as if fully set forth herein.

118.    Defendant and/or their affiliates or agents made at least four (4) solicitation sales calls to Plaintiff without having a valid telephone solicitation as required under Tex. Bus. Com. Code 302.

119.    As a result of Defendant's and/or their affiliates or agents' violations of Tex. Bus. and

22

Com. Code 302.101 Plaintiff may seek damages of up to $5,000 for each violation.  Tex. Bus.
and Com. Code 302.302(a).

**120.**    As a result of Defendant's and/or their affiliates or agents' violations of Tex. Bus. and

Com. Code 302.101 Plaintiff may seek all reasonable costs of prosecuting this action, including

court costs, deposition costs, and witness fees.  Tex. Bus. and Com. Code 302.302(d

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against Defendant

ALLIANCE as follows:

A.    Leave to amend this Complaint to name additional DOESs as they are
identified and to conform to the evidence presented at trial;

B.    A declaration that actions complained of herein by Defendant violates the
TCPA and Fla. Stat. 501.059 and Florida Telemarketing Act;

C.    An award of $1500 per call in statutory damages arising from the TCPA 47
U.S.C §227(c) intentional violations jointly and severally against the corporations for
36 calls.

D.    An award of $1500 per call in statutory damages arising from the TCPA 47
U.S.C § 227(c)(5) intentional violations jointly and severally against the corporations
for 36 calls.

E.    An award of $1,500 per call in statutory damages arising from Fla. Stat. §
501.059(1)(g) intentional violations, pursuant to Fla. Stat. § 501.059(10)(a)(b) for
32 calls.

F.    An award of $1,500 in statutory damages arising from violations of the
Texas Business and Commerce code 305.053 intentional violations jointly and

severally against the corporation for four (4) calls.

G.    An award of $50,000 in punitive damages arising from intentional violations of Fla. Stat. 501.616(6)(b).

H.    An award of $50,000 in punitive damages arising from intentional violations of Fla. Stat. 501.616(7)(b).

I.    An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 intentional violations jointly and severally against the corporation for four (4) calls

J.    An award to Plaintiff of interest, costs, and attorneys' fees, as allowed by law and equity.

K.    Such further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

August 17, 2023,                          Respectfully

Joshua Cacho
Plaintiff, Pro Se
164 Estella Rd
Lake Mary, Florida
407-577-3823